IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAMA PRAYAGA,<br><br>*Defendant*. | **UNDER SEAL**<br><br>Case No. 1:24-MJ-223 |

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Alec C. Schmidt, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is being submitted in support of a criminal complaint charging RAMA PRAYAGA (hereinafter "PRAYAGA") with committing health care fraud in violation of Title 18, United States Code, Section 1347.

2. This affidavit is submitted for the limited purpose of obtaining a criminal complaint and arrest warrant. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

3. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since August 2021. I am currently assigned to a squad within FBI's Washington Field Office that primarily investigates health care fraud. As an FBI Special Agent, I have received extensive training in the enforcement of the criminal laws of the United States, as well as extensive training in criminal investigations. I have conducted and participated in numerous investigations involving health care fraud. During these investigations, I have been involved in the application

1

for and execution of many arrest and search warrants for health care fraud related offenses, resulting in the arrest, prosecution, and conviction of numerous individuals. Through my training and experience, I am familiar with the indicators of health care fraud such as dual submissions of medical claims, billing for services not rendered, and performing medically unnecessary procedures in order to maximize insurance payouts. Other indicators include providers submitting claims for patients in states they are not licensed, submitting dual claims for services to multiple carriers, and billing for services while out of the country or travelling for long periods.

**BACKGROUND ON HEALTH CARE BILLING**

4.  Current Procedural Terminology ("CPT") codes are standardized terms and codes used to describe medical, surgical, and diagnostic services performed by health care professionals and physicians. The American Medical Association ("AMA") develops and maintains the CPT coding system, which is used in medical billing by both government insurers—like Medicare and Medicaid—and private insurers to process health insurance claims. Some CPT codes are time-based, meaning that they are based on the time spent with a patient on the day of an encounter.

5.  For example, the CPT code 99214 is used for an office or outpatient visit, lasting between 30 and 39 minutes, for an established patient with a progressing illness or acute injury requiring medical management or potential surgical treatment. A visit billed under this code would generally involve a medically appropriate history and/or examination and moderate level of medical decision making.

6.  The CPT code 99213 is used for an office or outpatient visit, lasting between 20 and 29 minutes, for an established patient with a stable chronic illness or acute but uncomplicated injury. A visit billed under this code would generally involve a somewhat lower level of complexity with regard to medical decision making compared to 99214.

2

7.     I am familiar with a common pattern among medical providers who commit health care fraud, namely, submitting claims to maximize revenue while not actually performing a service, or performing a much less complex or time-intensive service.  In some cases, the use of time-coded services can be masked across different private insurance carriers. Private medical insurance claims information is siloed, but when information is combined across carriers, it can illustrate trends that indicate health care fraud.

8.     One of these trends is referred to as "upcoding," *i.e.*, billing a higher-complexity time code for a lesser or minimal patient encounter.  The most egregious form of upcoding results in an "impossible day," which involves billing for services in a single day where the time-coded services exceed 24 hours.

**PROBABLE CAUSE**

9.     PRAYAGA is a psychiatrist licensed in Virginia, Maryland, New York and the District of Columbia.  He owns and operates a medical practice called "New Tele Doc," also known as "New Stress Clinic," and he has offices located in Alexandria and Tysons Corner, Virginia, as well as Northwest Washington, D.C.

10.    Law enforcement has been investigating PRAYAGA for committing healthcare fraud by submitting false or fraudulent billings for services.  PRAYAGA's fraud scheme involves two patterns of conduct: first, upcoding for minimal patient interactions—to the point of billing multiple "impossible days"—and second, billing for medically unnecessary or inappropriately performed transcranial magnetic stimulation ("TMS") services.

11.    TMS is a non-invasive procedure that uses magnetic pulses to stimulate nerve cells in the brain.  It is ostensibly used to treat symptoms of major depression, particularly in patients for whom anti-depressants are ineffective or have excessive side effects.

12.     Based on my training and experience, I know TMS treatments must be overseen by a licensed medical professional.  When overseen by a licensed medical professional who is physically present, these services can be rendered by an unlicensed individual and billed "incident to" using the name and medical credentials of the medical professional.  When not over-seen by a medical professional, these services cannot be billed to third-party health benefit programs.

Interviews with PRAYAGA's Patients

**Patient-1**

13.     On or about October 24, 2022, I met with a former patient of PRAYAGA ("Patient-1").  Patient-1 initially came to PRAYAGA in or around October 2020 at PRAYAGA's Alexandria office to have Patient-1's child's mental health evaluated.  During the child's initial visit, PRAYAGA suggested that Patient-1 was suffering from mental health issues because of the concern for Patient-1's child.  PRAYAGA recommended TMS therapy treatment for Patient-1 on the first visit, which was supposed to be for treatment for Patient-1's child.  PRAYAGA had Patient-1 undergo TMS after orally administering ketamine, a Schedule III controlled substance, mixed with a soda.

14.     According to Patient-1, appointments with PRAYAGA lasted five to ten minutes, and PRAYAGA never reviewed a patient chart or record with Patient-1.  Patient-1 said PRAYAGA constantly tried to rush Patient-1 and her child out of his office so he could see other patients.  Patient-1 described PRAYAGA's treatment plans as lacking any sort of thoroughness compared to other physicians or psychiatrists. Patient-1's child was hospitalized and eventually had to go into intensive psychiatric care after seeing PRAYAGA for approximately one year.

4

15.     A review of billed claims submitted by PRAYAGA to Aetna for Patient-1's appointments show that PRAYAGA used CPT code 99213 (20–29 minutes) for her appointments, even though Patient-1 stated her appointments were typically only five to ten minutes.

**Patient-2**

16.     On or about November 3, 2022, I met with another former patient of PRAYAGA ("Patient-2"), who left a negative online review of PRAYAGA's practice in which he referred to PRAYAGA as a "drug dealer."  Patient-2 told me that his first visit with PRAYAGA was in or around March 2019 at PRAYAGA's Alexandria office and lasted approximately ten minutes. When Patient-2 first sat down, PRAYAGA asked Patient-2 what medications Patient-2 would like to receive.  Patient-2 had submitted his medical history through an online portal associated with PRAYAGA's practice prior to the visit, but PRAYAGA made no inquiry or reference to the information Patient-2 provided during the in-person visit.

17.     Patient-2 stated that PRAYAGA's office was like a revolving door of patients waiting in their vehicles and in the office to be seen, and patients typically only saw the doctor for five minutes or less.

18.     After seeing PRAYAGA for approximately three months, Patient-2 was having problems with the prescribed medication and felt more depressed than he had been prior to seeing PRAYAGA. Patient-2 sent an email to PRAYAGA's office with concerns, and PRAYAGA responded by advising him to take more of the medication.  When the depression persisted, Patient-2 emailed PRAYAGA again and was then told to take less of the medication.  Patient-2 was eventually hospitalized due to the severity of his depression and stopped seeing PRAYAGA.

19.     A review of Patient-2's insurance claim information reveals that PRAYAGA consistently billed CPT codes 99214 (30–39 minutes) and 99213 (20–29 minutes) for Patient-2's appointments.

**Patient-3**

20.     Patient-3 was interviewed on or about March 19, 2024.  Patient-3 began treatment with PRAYAGA in or around February 2019 after being recommended to his practice by an acquaintance.  Patient-3 recalled seeing PRAYAGA in two different D.C. office locations, one on or near 14th Street NW and one near Dupont Circle.  Patient-3 recalled only having in-person visits, not telehealth.

21.     Patient-3 believed her first appointment lasted 15 minutes at the most and recalled being asked a short series of questions.  In that time, PRAYAGA diagnosed her with attention deficit/hyperactivity disorder ("ADHD") and told her she would be a good candidate for Adderall (generic name dextroamphetamine), a Schedule II controlled substance.

22.     Patient-3 stated that throughout the time that PRAYAGA prescribed her Adderall, PRAYAGA never talked to her about the intended effects or side effects, or about the differences between different types, such as extended-release or immediate-release.   Patient-3 recalled PRAYAGA telling her that Adderall may give her a loss of appetite which could be a "benefit" to her, which Patient-3 interpreted to mean that PRAYAGA was telling her it could cause her to lose weight.  Patient-3 felt this was inappropriate.

23.     Patient-3 stated that she went back to PRAYAGA every month for refills of her medication, for office visits that lasted no more than two or three minutes.  When Patient-3 saw PRAYAGA, he typically asked her only, "Is everything good with your meds?"  After asking about the medications, PRAYAGA usually made comments about politics and/or the weather and did

6

not engage in any further discussion of her medical condition or treatment plan.  PRAYAGA provided Patient-3 with a hand-written prescription for medications and she left.

24.    Patient-3 did not go to PRAYAGA for depression; however, Patient-3 recalled a time when PRAYAGA prescribed her bupropion, an anti-depressant, for seasonal affective disorder. When PRAYAGA prescribed the bupropion, he did not talk to Patient-3 about how the medication would interact with what she was currently taking.

25.    Patient-3 stated that PRAYAGA never performed any type of physical examination, asked no questions about her past medical history, and did not discuss possible medication interactions.  Patient-3 continued office visits with PRAYAGA because it became a matter of convenience; however, she stopped going to PRAYAGA after the pharmacy that Patient-3 used refused to fill prescriptions issued by PRAYAGA.

26.    Eventually, Patient-3 obtained a thorough, independent psychological evaluation from an outside provider that indicated she had ADHD.  Patient-3 stated that after that assessment, she felt comfortable going to a "real" doctor for her medication.

27.    A review of Patient-3's insurance claims data shows that PRAYAGA consistently billed CPT code 99214—as noted above, a 30-39 minute patient medical history evaluation with moderate medical complexity—for the majority of Patient-3's visits, which in reality lasted only two or three minutes.

**Patient-4**

28.    Patient-4 was interviewed on or about March 22, 2024.  Patient-4 had originally been treated by a psychiatrist prior to be treated by PRAYAGA.  In or around 2019, Patient-4 had to find a new psychiatrist after he switched jobs and got new health insurance.  She found PRAYAGA on Zocdoc, which is an online platform that allows people to find medical providers

7

and book in-person or telemedicine appointments. Patient-4 chose PRAYAGA because PRAYAGA was accepting new patients and had availability for weekend appointments.

29. Patient-4 recalled that when making her appointments for a Saturday, PRAYAGA had at least three additional appointment times available. Based on Patient-4's previous treatment, Patient-4 knew it was difficult to find a psychiatrist accepting new patients with any immediate availability, let alone multiple weekend appointments.

30. Patient-4 stated that her first appointment, in or around May 2019, was at the Alexandria office and lasted approximately ten minutes in duration. Patient-4 stated that this first visit "seemed fine," and the visit largely entailed a conversation in which PRAYAGA ultimately provided the prescriptions she was requesting based on their prior psychiatric treatment. However, Patient-4 also recalled that in the first visit, PRAYAGA strongly pushed her to undergo TMS, assuring her that her insurance would cover the treatment. Patient-4 declined the TMS treatment.

31. All of Patient-4's subsequent appointments with PRAYAGA were telehealth appointments, which lasted approximately 90 seconds to four minutes in duration. At every appointment, PRAYAGA tried to push TMS, and Patient-4 told him at every appointment that she was "not comfortable with that."

32. Patient-4 said that everything about PRAYAGA's treatments felt "scummy." She recalled that the doors to interior treatment rooms were hollow and felt that there was no privacy during patient appointments; she felt as if everyone outside in the waiting room could hear what was being said in the treatment rooms. Additionally, Patient-4 recalled multiple telehealth appointments in which PRAYAGA was driving his vehicle—and at one point was eating while driving—while taking the video appointment from his phone. Patient-4 believed that PRAYAGA may have conducted some of the telehealth visits from his residence as well.

33.    A review of Patient-4's insurance claims information revealed that PRAYAGA billed CPT code 99214 (30–39 minutes) for the majority of Patient-4's visits, which Patient-4 recalled lasting only 90 seconds to four minutes.

34.    Patient-4 stopped going to PRAYAGA in or around summer 2020.  She believed she went to roughly 12 to 14 visits with PRAYAGA in total.  At first, PRAYAGA sent Patient-4's prescriptions in a timely manner; however, Patient-4 started noticing that the prescriptions would be a day late.  Patient-4 decided to leave the practice after PRAYAGA did not send her prescription to the pharmacy for three days.

35.    Patient-4 recalled that she never understood why PRAYAGA would not write 90-day prescriptions, as Patient-4's former psychiatrist had done.  PRAYAGA insisted on Patient-4 making monthly appointments and providing 30-day prescriptions.  Based on my training and experience, I believe this is because PRAYAGA wanted to bill Patient-4's insurance for monthly visits rather than quarterly visits.

**Patient-5**

36.    Patient-5, who was interviewed on or about April 11, 2024, first learned of PRAYAGA's services through a friend in or around 2018.  Patient-5's first appointment was in December 2018. Patient-5 discussed their medical history with PRAYAGA, and PRAYAGA prescribed them medication on their first appointment.  Patient-5 said that the in-person appointments were typically short and lasted approximately 10 or 15 minutes.

37.    In or around December 2019, PRAYAGA provided Patient-5 with a laboratory order for a urinalysis to test for the presence of outside substances and told Patient-5 that the test had to be completed within 45 days.  Patient-5 stated that PRAYAGA did not administer regular drug tests, nor did he require drug tests to be administered on the spot in the office.  Based on my

9

training and experience, I am aware that doctors administer random drug tests in order to detect the absence of prescribed medication (an indication of drug diversion) or the presence of illicit drugs. When drug tests are not random, or the patient has time to complete the drug test, the patient can take steps to ensure that they "pass" the drug test.

38.    Patient-5 began virtual appointments on or about June 6, 2019. For virtual visits, Patient-5 received a link to make their co-payment and then have access to another link for their appointment. PRAYAGA's office continuously sent emails concerning payment, and specifically that co-payments were due prior to the office visit. Patient-5 said the virtual appointments usually lasted less than one minute.

39.    In the telehealth visits, PRAYAGA asked Patient-5 how they were doing and told them that their medication would be sent to the pharmacy. There were times when Patient-5 tried to tell PRAYAGA about their mental health, but PRAYAGA did not seem interested. During one of their telehealth visits, PRAYAGA appeared to be driving and taking the virtual appointment from his phone. During one telehealth appointment, Patient-5 explained that their father had passed. PRAYAGA simply told Patient-5 to "hang in there" and that their medication would be sent to the pharmacy.

40.    A review of Patient-5's claims information revealed that PRAYAGA billed CPT code 99213 (20–29 minutes) for the majority of Patient-5's appointments, even though according to Patient-5—with the exception of the first visit—the appointments lasted one minute or less.

41.    Patient-5 stopped seeing PRAYAGA in December 2023 after they met with their primary care provider and discussed the medications they were on. Patient-5's primary care provider thought that they should try not using the medication and seek other treatment for their mental health.

Undercover Operation

42.    On or about September 15, 2022, the Honorable Michael S. Nachmanoff, United States District Judge, issued an Order authorizing the use of undercover officers to investigate PRAYAGA for a period of six months.  This first period expired March 15, 2023, but was renewed on April 17, 2023, and the second period lasted until December 2023.  This investigation made use of three separate undercover law enforcement officers (UC-1, UC-2, and UC-3).

**UC-1**

43.    On or about January 17, 2023, UC-1 met with PRAYAGA at PRAYAGA's medical office in Alexandria, Virginia for an initial visit, which was audio- and video-recorded.  Prior to the visit, UC-1 submitted medical history through an online portal associated with PRAYAGA's practice.  When UC-1 entered the office, PRAYAGA's receptionist administered a blood pressure and temperature check and reaffirmed the UC's medical history.  PRAYAGA did not reference or review the UC's submitted medical history during the appointment.

44.    In the appointment with PRAYAGA, UC-1 stated that he was having trouble concentrating due to work-related issues.  PRAYAGA responded to UC-1, "If you wanted to talk through mental health issues, it is fine to see a therapist or maybe a religious person. I don't want to sound like a drug pusher, but the reality is, medication is better. I am a fan of medication."

45.    PRAYAGA then told the UC-1 that he would prescribe Adderall, which as noted above, is the brand name for dextroamphetamine, a Schedule II stimulant.  PRAYAGA described Adderall to UC-1 as "like dating a really hot girl; but to be careful not to destroy her too much." PRAYAGA then told UC-1 that he would prescribe bupropion, an antidepressant.  PRAYAGA described bupropion as "like dating a very, very average girl.  Not too exciting but very consistent." UC-1 did not mention having any issues sleeping, but PRAYAGA told UC-1 that he would also

11

prescribe trazodone, another antidepressant, to help with sleep. PRAYAGA told UC-1 that all further visits would be virtual, rather than in-person.

46.    This initial visit lasted approximately seven minutes and cost $130, which was the out-of-pocket cost. PRAYAGA prescribed UC-1 30 units of 100mg bupropion, 30 units of 50-mg trazodone, and 30 tablets of 10-mg dextroamphetamine (generic Adderall).

47.    On or about February 15, 2023, UC-1 had a virtual appointment with PRAYAGA that was audio- and video-recorded and monitored. When UC-1 connected with PRAYAGA, PRAYAGA stated that he would send UC-1's medication to the pharmacy. There was no discussion of the prescribed medications or UC-1's mental health, and the entire appointment lasted approximately 20 seconds. UC-1 was charged $130 for the out-of-pocket cost.

48.    PRAYAGA prescribed UC-1 the same amount of bupropion and trazadone, but apparently forgot to prescribe the dextroamphetamine. UC-1 contacted PRAYAGA's office through email to ask about the missing dextroamphetamine but received no response.

49.    On or about March 14, 2023, UC-1 had another virtual appointment with PRAYAGA that was monitored and recorded. When UC-1 connected with PRAYAGA, UC-1 asked PRAYAGA about the missing dextroamphetamine. PRAYAGA looked confused and told UC-1 to email him about the Adderall and the medication would be there. This virtual visit lasted approximately 35 seconds, and UC-1 was charged $130 for the out-of-pocket cost.

50.    On or about March 24, 2023, I received billable insurance cards from BlueCross BlueShield ("BCBS") to use in an undercover capacity for UC-1. Thus, on UC-1's next appointment and all subsequent appointments, the billable insurance card would capture what services PRAYAGA billed to UC-1. PRAYAGA back-billed BCBS for all previous appointments with UC-1, even though UC-1 had previously paid the full cost out-of-pocket for the patient visits.

12

51.    Thereafter, UC-1 had additional telehealth visits with PRAYAGA on the following dates in 2023: May 1, June 7, July 13, August 10, September 7, and October 11.  Each of these telehealth visits lasted approximately 10-15 seconds, the bulk of which was PRAYAGA telling UC-1 he would send his medication to the pharmacy.  If UC-1 attempted to ask questions, PRAYAGA cut him off and told him to send an email.

52.    A review of the claims information obtained from BCBS revealed that for each of these seconds-long visits, PRAYAGA billed BCBS the procedure code 99213, which as noted above, corresponds to a patient encounter of low-to-moderate complexity lasting between 20 and 29 minutes.

53.    During UC-1's last appointment with PRAYAGA, UC-1 told PRAYAGA that he had moved to Florida—where PRAYAGA is not licensed to practice medicine—and asked PRAYAGA to fill the prescription there. When PRAYAGA said he could not do that, UC-1 asked PRAYAGA to send the prescriptions to the Virginia pharmacy and he would have a friend pick them up and sent to Florida. PRAYAGA filled this last prescription for UC-1.  Based on my training and experience, a physician knowingly prescribing to and treating a patient residing in a state which they are not licensed is an indicator of health care fraud and fraudulent billing.

**UC-2**

54.    UC-2 had their first appointment with PRAYAGA virtually on or about July 30, 2023.  UC-2 told PRAYAGA that they had gained weight and felt anxious.  After speaking to UC-2 for approximately five minutes, PRAYAGA prescribed UC-2 15 units of ½-milligram alprazolam (brand name Xanax, a Schedule IV controlled substance).

55.    In the first visit, PRAYAGA also recommended that UC-2 receive a "brain-mapping" service and told UC-2 that it would be covered by insurance.  PRAYAGA promoted

13

brain mapping as a way to uncover the root problem of mental health ailments, in five to ten sessions. PRAYAGA also promoted ketamine treatments to UC-2, which he said would also be covered by insurance.  UC-2 declined both brain mapping and ketamine treatments.

56.     UC-2 also had an undercover BCBS insurance card. Billing records showed that for UC-2's first visit, which lasted a total of approximately five minutes, PRAYAGA billed CPT code 90792, which corresponds to a new patient in-office visit of 60 minutes.

57.     UC-2 had subsequent telehealth appointments with PRAYAGA on the following days in 2023: August 7, August 25, and October 13.  The subsequent appointments that UC-2 attended lasted approximately 10 to 20 seconds each.  Nevertheless, PRAYAGA billed each appointment as CPT code 99213.

**UC-3**

58.     UC-3 had their first appointment with PRAYAGA on or about July 27, 2023. The appointment was in person and lasted approximately 15 minutes. When UC-3 filled out patient intake information online prior to the appointment, they said they had anxiety and thoughts of suicide.  PRAYAGA mentioned brain mapping during the first appointment with UC-3 and gave UC-3 a paper prescription for ¼-milligram alprazolam.  PRAYAGA asked if UC-3 had family they could talk to about their problems but did not bring up the patient information concerning suicidal ideation.

59.     UC-3 had subsequent telehealth appointments with PRAYAGA on September 5 and October 10, 2023. PRAYAGA billed BCBS CPT Code 90792 for the initial in-person visit and 99213 for the following telehealth visits, although the telehealth appointments lasted approximately 15 seconds.

<u>Interview with PRAYAGA's Former Employee</u>

60.    In and around June 2024, case agents interviewed a former employee of PRAYAGA ("Witness-1").  Witness-1 was originally hired to work the "back office" and worked at the practice in and around 2018 and 2019.  The "back office" consisted of performing administrative functions involving claims submission and accounts receivable.

61.    Witness-1 worked at PRAYAGA's Alexandria office, which was open from approximately 7:00 a.m. or 8:00 a.m. until approximately 7:00 p.m.  During the time Witness-1 worked for PRAYAGA, PRAYAGA split his time between his Alexandria office and Washington D.C. office.  Witness-1 stated that PRAYAGA only saw patients at his Alexandria office from approximately 10:30 a.m. to 1:00 p.m.  PRAYAGA saw patients at his Washington, DC office after 1:00 p.m.  Witness-1 believed that PRAYAGA saw an average of 40 to 50 patients per day, and some days may have seen as many as 60 patients.  Witness-1 estimated that PRAYAGA's patient appointments lasted approximately five minutes in duration at most.

62.    After some time working for PRAYAGA, Witness-1—who is not a trained medical professional—began administering TMS treatments at PRAYAGA's office.  Witness-1 stated that he often performed TMS therapy on patients when PRAYAGA was not on the premises to oversee the therapy.  As noted above, generally for TMS therapy to be reimbursable by insurance, the physician must be physically present in the area and directly supervising.

63.    Witness-1 recalled that he and three other non-medical staff, along with PRAYAGA, were trained on the administration of TMS therapy by representatives of the medical device company that sold the TMS equipment to PRAYAGA.  The training consisted of approximately one hour of instruction followed by approximately one hour of hands-on practice per person.  During the hands-on instruction, participants practiced setting up the treatment on

15

each other.  Witness-1 indicated that training took in total about four to five hours.  In addition to himself, Witness-1 was aware of two other non-medical staff who performed the TMS therapy at PRAYAGA's practice.  Witness-1 stated that PRAYAGA did not administer the TMS treatment but may have come into the room on occasion when he was at the office.

PRAYAGA's Claims Data

64.    The UC claims billed to BCBS and the recordings of the UC patient visits were reviewed by an outside expert specializing in health insurance coding and billing in May 2024. Following her review, the expert advised me that none of the claims submitted by PRAYAGA for the UC appointments met the proper threshold of patient evaluation, medication management or the treatment of any of the diagnosis codes PRAYAGA attributed to the UC's.

65.    The FBI obtained claims submitted by PRAYAGA from private insurance carriers CareFirst BCBS, Anthem BCBS, Aetna, Cigna and United Health, for the period of 2018 to October 2023.  FBI also obtained claims information for the same period from federally funded programs TriCare, Medicare, Medicaid, and the Federal Employee Health Benefit Program. The FBI's Data Analysis Reponses Team (DART) provided an analysis based on the claims information compiled.  The analysis of PRAYAGA's claims data shows several indicia of health care fraud:

a.    PRAYAGA billed claims for patients living in states he is not licensed. PRAYAGA is licensed in New York, Maryland, the District of Columbia, and Virginia but billed to 39 states in which he is not licensed.

b.    PRAYAGA billed claims for services while he was out of the country.  A comparison between claims data and international travel records from the Department of Homeland Security shows that since 2018, PRAYAGA billed insurers for a total of

16

approximately $155,963 for services while he was traveling abroad. This includes for services that would require him to be on-site, such as TMS.

c. The claims data shows that PRAYAGA billed claims with dates of service of virtually every day of the year, including weekends. Specifically, PRAYAGA billed 364 days in 2018; 362 days in 2019; 364 days in 2020; 363 days in 2021; and 364 days in 2022. As of October 2023, PRAYAGA had billed 324 days for the year.

66. The claims data shows that for 2018 through October 2023, PRAYAGA claimed to have worked for a total of approximately 2,494 days. Of those 2,494 days, PRAYAGA billed 298 days in which he claimed to have had patient interactions for more than 24 hours in a day; *i.e.*, he billed insurance providers for 298 "impossible days." Likewise, PRAYAGA billed 313 days in which he claimed to have had patient interactions for 20 to 24 hours, which based on my training and experience, I believe to be highly improbable. He billed 579 days in which he claimed to have patient interactions totaling between 16 and 20 hours. He billed 842 days in which he claimed that his patient interactions totaled between 8 and 16 hours. Of the 2,494 days, there were only 108 days in which he billed for 8 hours of time or less.

67. Based on the claims data obtained, from approximately 2018 to October 2023, PRAYAGA billed the private and public health benefit programs a total of approximately $27,172,656.11. Based on the submitted claims, PRAYAGA was paid $14,871,527.43.

68. Of the submitted claims, more than $12 million dollars was billed for CPT codes 99213 and 99214, time-based codes which represent an encounter lasting at least 20 minutes in duration. The private and public health benefit programs paid PRAYAGA more than $7 million for claims billed under CPT codes 99213 and 99214.

69.    Of the submitted claims, PRAYAGA billed more than $10 million dollars for TMS therapy, a treatment which needs to be over-seen by a medical professional.  The private and public health benefit programs paid PRAYAGA almost $6 million for TMS therapy.

**CONCLUSION**

70.    Based upon the foregoing, I submit there is probable cause to believe that between in and around 2018 through the present, within the Eastern District of Virginia and elsewhere, the defendant, RAMA PRAYAGA, did knowingly and willfully execute, and attempt to execute, a scheme or artifice to defraud any health care benefit program; and to obtain by means of materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program; in connection with the delivery of or payment for health care benefits, items, or services; including, at minimum by submitting the following claims, in violation of 18 U.S.C. § 1347:

| Count | Date Submitted | Date of Service | Patient | CPT Code Billed | Length of Appt. |
|---|---|---|---|---|---|
| 1 | August 14, 2024 | August 10, 2023 | UC-1 | 99213 | 13 seconds |
| 2 | October 16, 2023 | October 13, 2023 | UC-2 | 99213 | 10 seconds |
| 3 | October 13, 2023 | October 10, 2023 | UC-3 | 99213 | 29 seconds |

Respectfully submitted,

Special Agent Alec Schmidt
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of
Fed. R. Crim P. 4.1 via telephone this 14th day of June, 2024.

The Honorable Lindsey R. Vaala
United States Magistrate Judge